# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 16, 2011

## IN RE: AIDEN R. B., ET AL.

**Appeal from the Juvenile Court for Sevier County**
**No. 10001469, 10001471    Dwight Stokes, Judge**

**No. E2011-00147-COA-R3-PT-FILED-JUNE 7, 2011**

Amy B. ("Mother") is the biological mother of the minor children, Aiden R. B. and Evan M. B. ("the Children"). The State of Tennessee Department of Children's Services ("DCS") filed a petition to terminate Mother's parental rights to the Children. Following a trial, the Juvenile Court for Sevier County ("the Trial Court") found and held, *inter alia*, that clear and convincing evidence existed to terminate Mother's parental rights to the Children on four grounds under Tenn. Code Ann. § 36-1-113(g)(1), (2), and (3) and that termination was in the Children's best interest. Mother appeals the termination of her parental rights. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Amy B.

Robert E. Cooper, Jr., Attorney General and Reporter; and Marcie E. Greene, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children's Services.

Robert L. Huddleston, Maryville, Tennessee, Guardian Ad Litem.

# OPINION

## Background

In September 2010, DCS filed a petition to terminate Mother's parental rights to Aiden R. B. and Evan M. B. In the petition, DCS alleged that the Children had been in foster care continuously since DCS removed them from Mother on July 16, 2009. As grounds for terminating Mother's parental rights, DCS alleged that: (1) Mother had abandoned the children by willfully failing to support the Children or making only token support payments towards the Children's support in the four month period immediately preceding the filing of the petition; (2) Mother had abandoned the children through failure to provide a suitable home; (3) Mother had failed to substantially comply with the responsibilities and requirements set in her permanency plans; and (4) the conditions which led to the Children's removal or other conditions which made the Children's return to Mother's care unsafe continued to exist. DCS further alleged that it was in the Children's best interest for Mother's parental rights to be terminated.

DCS's petition also sought to terminate the parental rights of John F., putative father of Evan M. B., and, Jimmy D., putative father of Aiden R. B. As only Mother appeals, we will not address these putative fathers.

This case was tried in December 2010. Mother testified that she sent the Children into DCS custody in July 2009 because of her unemployment and the danger posed by her then-paramour and co-resident, Steven V. Mother stated that she was "finally able to get away from" Steven V. when he was incarcerated in July 2010. Mother affirmed that Steven V. had hurt the Children. However, Jodi Dalton ("Dalton"), case manager with DCS, testified that Mother originally claimed that her mother and grandmother put these ideas of fear in Evan M.B.'s head.

In the summer of 2010, Mother petitioned to have the court dismiss a no contact order between Steven V. and the Children. Mother acknowledged in the termination hearing that she lied about Steven V. when she sought to have the no contact order dismissed:

Q      Then why in the summer of 2010 did you try to get this court to dismiss the no contact order between [Steven V.] and your children?

A      Because if I hadn't of done that for him he would have killed me. He would have hurt me.

Q.      But you knew very well if you succeeded and if the Court had granted

your wish he would have been able to hurt those children, wouldn't he?

A.     Somehow–God works in mysterious ways. I knew for a fact in my heart and in my mind that God wasn't going to let him hurt my kids no more, if anything he would somehow make a way for me not to have to be with him anymore so he can't be around my kids to hurt my kids. And what happened? He went to jail, thank God.

Maura Maurer ("Maurer") of Helen Ross McNabb worked on the Children's case. Maurer testified about incidents that occurred during Mother's visits with the Children:

Really the one that stands out in my mind was when she brought her camera and was showing pictures of [Steven V.] to the boys and I told her to not do that. At the next visit after that we were at the park and she got her camera out again and showed pictures and I told her that it was not appropriate to do that as I have discussed it with DCS and she said she was going to show them anyways because her attorney told her she could.

Per the permanency plans, which were entered as exhibits, Mother was to perform the following tasks: (1) complete an age appropriate parenting class and provide proof to DCS; (2) continue with Peninsula, follow Peninsula's recommendations, and sign a release for DCS; (3) obtain and maintain stable housing, reliable transportation, and a legal source of income; (4) complete a drug and alcohol assessment, follow recommendations, and provide proof to DCS; (5) learn about the children's medical issues and how to care for them by attending appointments; and (6) have an STD panel and provide proof to DCS. The permanency plans were revised on February 23, 2010 and ratified on May 12, 2010. The Juvenile Court found the plans' requirements to be reasonably related to remedying the conditions that necessitated foster care.

Mother testified as to the various places that she lived during the period between DCS' taking the Children into custody and trial. At the time of the Children's removal by DCS, Mother lived with Steven V., Steven V.'s mother, Steven V.'s brother, and Steven V.'s brother's girlfriend, in a house in Sevierville. Around August or September 2009, Mother lived with Steven V. and roommate Ricky in a trailer by Douglas Dam in Dandridge. From October 2009 through December 2009, Mother lived with Steven V., his mother, and, for a short period, Steven V.'s uncle Tony and Tony's wife, in a townhouse in Sevierville. From January 2010 to March 2010, Mother and Steven V. lived at Cornerstone Apartments in Sevierville. From March 2010 until sometime in the summer of 2010, Mother lived with Steven V. and his mother in a condo in Gatlinburg. For three days before Steven V. was arrested, Mother and Steven V. stayed at Cold Creek Resort in Pigeon Forge. Mother

stated that from July 2010 to August 2010, she lived with a friend, Josh W., and his two roommates, in Gatlinburg. From the end of August 2010 until September 28, 2010, Mother lived in a hotel in Pigeon Forge, with Sherry V., Mother's mother, paying the rent. After September 28, 2010, Mother moved in with her new boyfriend, Jacob W. Mother spent approximately three nights with Jacob W. before moving out of his parents' house and into a place of their own on Ridge Road in Pigeon Forge. On October 20, 2010, Mother was jailed for failure to appear at a show cause hearing held on September 29, 2010. Mother was released from jail on November 16, 2010, and moved into a place with Jacob W. and four roommates. Jacob W. stated that he knew one roommate, Lance, and the remaining roommates were Lance's friends. Jacob W. testified that he was unemployed at the time of trial. Mother stated that she did not contribute to rent at her residence at the time of trial.

Regarding her number of residences, Mother testified: "Yes. I know I'm not stable enough for the kids to come to my house and live with me but they do deserve to be with their family. Every single time we see those kids they cry wanting to come home to their family. It's not about me, it's about the kids." Maurer testified that she discussed with Mother the possibility of Mother going to a women's shelter. Mother testified that she had discussed with Maurer and Dalton the prospect of going to a homeless shelter. Mother referenced the homeless shelter in Knoxville and stated that it was "[c]rawling with crack heads" and she would "rather sleep under a bridge than to be around a bunch of crack heads."

Mother testified about the various jobs that she held. Mother worked at a Marathon gas station for around two weeks in April or May of 2010. Mother stated that Steven V. got her fired from the gas station through an argument the two had on her job. In July or August 2010, Mother worked for commission at Crawdaddy's as a photographer. Mother also briefly worked at a strip club. At the time of the hearing, Mother stated that she had no job and relied on her mother, Sherry V., for transportation. Mother testified that she could not get a job because her birth certificate was locked in Steven V.'s storage unit and that she needed the birth certificate to receive a photo I.D. Mother possessed the key to the storage unit while Steven V. was in jail but gave the key to a friend of Steven V.

Mother testified that she made a two hundred dollar ($200) child support payment for each of the Children in February 2010. Mother stated that she was involved in a program whereby the participant is given gas money in order to find a job. Mother was discharged from the program after failing to attend classes. Records entered as an exhibit show that Mother made an additional two hundred and fifty dollar ($250) payment for each child in November 2010.

Mother testified that she underwent an alcohol and drug assessment. Mother admitted that she lied to the assessor concerning her past cocaine use, testifying "…I lied to

the assessor to be quite honest with you, yes, I lied." According to a Motion to Amend that was granted in the Trial Court and entered as an exhibit, Mother failed a drug test in September 2009. Mother testified that she refused to take a drug test on December 7, 2010 and explained her reasoning:

> Q. Did you submit?
>
> A. No, I did not.
>
> Q. Why not?
>
> A. Because the simple fact I have done every drug screen they have wanted me to do except for this one and like one more I think because I had a urinary tract infection and I didn't want to go through the pain of getting a urine sample but I did, however, say that day if a hair follicle or something was ordered on me I would be more than happy to do that. And I still would be more than happy to do a hair follicle right now. But I'm not peeing in any more cups for somebody who doesn't want my family to have my kids. I've done everything for them except for have a job which isn't for them, that's for me and my kids, sign a release I think is the last thing I need to do for them.

Mother was required under the permanency plans to attend medical appointments concerning the Children's health. Maurer testified that Mother did not attend any of these appointments. Mother also was required to receive treatment at Peninsula and sign a release so that DCS could monitor her progress. Mother testified that she never signed a release and that she stopped taking her medication in December 2009 or January 2010.

Maurer stated that Mother did not attempt to implement what she was taught at parenting classes during her supervised visits with the Children. Maurer testified about Mother's development, stating "[i]n the year plus that I've been working with [Mother] I have seen minimal improvement as far as stability and housing, stability in employment, there's not been much improvement in her ability to effectively parent them during those visits.…"

The permanency plans also held as a goal "exit custody" for the Children with a relative. Dalton testified about Mother's family and their relations with Mother and the Children:

> Q. You don't need to go anymore in the past history but when you

mentioned the volatility between [Mother] and her mother and grandmother have you observed some of that?

A.  Uh-huh. Yes.

Q.  Can you describe to the Court some of those instances?

A.  There was one particular visit, this one I was actually over the phone where [Mother] and her mother and grandmother had gotten into it at a park, the visit was at a park. Where to the point [Mother] was so upset she called me on the phone from the visit and she was very upset, she was talking about apparently it all started about [Steven V.] and the no contact and all that mess to the point I had to say, [Mother], calm down and go visit with your children.

Q.  What about did you observe any of this volatility in the summer of 2010 when we came here on Mr. Bennett's motion?

A.  There was several outbursts actually in the courtroom, there has also been outbursts in the hallway where they are just not getting along and that's hard for the children, the children were there watching it, witnessing all of it. There's also been Sherry and Thelma have stated to me personally different allegations that they knew things they had saw and witnessed in regards to abuse of the children or whether it wasn't [Mother] particularly as far as the abuse goes but other people involved in certain things. They reported sex abuse, they reported all kinds of things they knew were going on and they were enabling a lot of it to happen.

Dalton testified that Sherry V. and Thelma V., Mother's grandmother, were the only relatives who said that they were in a position to accept placement of the Children. Regarding Sherry V. and Thelma V., Dalton testified "we don't feel like they're appropriate to be in the parent role." Sherry V. testified that she failed a drug test for marijuana in January of 2009.

The Children came to live with a foster family in a pre-adoptive home setting. The foster father, Brian P. ("Foster Father"), testified that his goal was to raise the Children to be "moral good people, upstanding citizens in society" who would "do well in school or to do their best in school to become responsible adults and eventually be out on their own and have a family of their own." The foster family consisted of Foster Father and his wife, a son, and the Children. Foster Father testified that he works for a mortgage company and has the

-6-

means to support the Children. Foster Father also affirmed that the Children adapted well to home life with the foster family.

Following the trial, the Trial Court entered its order terminating Mother's parental rights.[1] The Trial Court found and held, *inter alia*:

### Ground I–Abandonment for Failure to Support (Applies to [Amy B.])

The Court finds that [Amy B.] abandoned the children in that she willfully failed to provide child support in the four (4) months prior to the Department filing its *Petition to Terminate Parental Rights* on September 21, 2010. She had a duty to provide child support. According to the testimony, which was uncontroverted, she was aware of that duty. She understood the consequences of that duty, and she had the ability to provide support. The testimony and exhibits reflected that she made payments totaling $450.00 for each child between February 2010 and November 2010–but none of those payments were made in the four (4) months prior to the filing of the *Petition to Terminate Parental Rights*. **By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(1) and 36-1-102(1)(A)(i) have been met for abandonment for failure to support.**

### Ground II–Abandonment for failure to provide a suitable home (Applies to [Amy B.])

[Amy B.] willfully failed to provide a suitable home for the children in that she lived in nine (9) or ten (10) places between July 2009 and December 2010. Prior to the children entering DCS' custody, the children's lives were imperiled due to the mother's free choice of roommate, namely, the mother's former paramour, [Steven V.]. The children were fearful of him. The mother testified that she feared for her life. Her duty to the children during this time was paramount. Prior to DCS coming into her life and after the children entered DCS' custody, the mother did not handle her living arrangements in a way that protected her children's safety.

The Department made reasonable efforts to assist her in locating alternate housing by discussing other options with her such as women's shelters and homeless shelters. Unfortunately, there is no way to be sure the

---

[1]The Trial Court reached no conclusions with respect to putative father John F., but did terminate the parental rights of putative father Jimmy D.

children would have been safe with relatives; the threat would have remained against the children whether they resided with relatives or not. The Department appears to have had other, more substantial concerns in not placing the children with relatives, such as alleged drug use by the maternal grandmother, [Sherry V.], and the volatile relationship between [Amy B.] and the maternal grandmother. It further appears that there was cause to believe that the maternal great-grandmother had a pattern of enabling the mother's behaviors.

The Court is most concerned by the mother's attempt in June, 2010 to come before this Honorable Court and attempt to have the restraining order against her paramour lifted so that he could enjoy contact with the children. The mother came before This Honorable Court and perjured herself in order to place her children in danger. The Court cannot understand or accept how she could do this. [Amy B.] has shown that she has the capability of making good decisions–such as turning the children over to DCS in July, 2009 when it was unsafe for them to continue living with her, but she did not continue to make good decisions with respect to housing and choice of roommates. **By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(1) and 36-1-102(1)(A)(ii) have been met for abandonment for failure to provide a suitable home.**

**Ground III–Substantial non-compliance with a permanency plan (Applies to [Amy B.])** [Amy B.] has failed to comply in a substantial manner with those reasonable responsibilities set out in the foster care plans related to remedying the conditions which necessitate foster care placement. There was testimony that the mother completed the alcohol and drug assessment but she did not complete it honestly; she did not sign releases for the Department in order to obtain her mental health records, and she did not provide safe, suitable housing, as has already been mentioned. The Court has already found that the Department made reasonable efforts to reunify her with her children, but the Court additionally notes that the Department subcontracted with Helen Ross McNabb who attempted to assist her with parenting skills. At the time of the hearing, the mother still lacked employment and transportation. **By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(2) and 37-2-403(a)(2) have been met;** and

**Ground IV–Persistent Conditions (Applies to [Amy B.])**

There is a persistence of conditions in this case in that, as the Court has already

-8-

noted, the mother, [Amy B.], was not able to provide suitable housing for her children from beginning to end. Her relationship with [Steven V.] colored the whole situation, indeed, it appears that she was romantically involved with him until July 2009 up to his own incarceration. The November 18, 2009 Adjudicatory Order confirmed the problem which led to the removal and persisted up to the time of the filing of the petition and persisted at the time of the termination hearings on December 9, 2010 and December 14, 2010. For the reasons already stated, the Court finds that the Department made reasonable efforts to assist the mother in remedying the conditions which led to removal. **By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(3) have been met**…

\* \* \*

## BEST INTEREST

The Court finds that the facts and circumstances in this case warrant a finding of best interest. The Court begins its analysis of the best interest of the children by noting that the foster parents are a positive factor in the children's lives. The Court is pleased that someone is willing to step-forward to take responsibility for these children and for these types of children. The foster parents serve a benefit to society. The mother's counsel attempted to cloud the foster parents' actions as part of a conspiracy. The Court does not agree. There was no testimony which would suggest that the foster parents are anything other than positive people, who will attempt to raise the children as moral, upright citizens.

The Court considered the testimony of the grandmother and the great grandmother, who mean well for the children. In retrospect, they may wish that they had taken other steps in order to obtain custody, but it is clear from the record that they did little other than exercise visitations with the children.

The mother subjected the children to great uncertainty in their lives. The Court notes several of the factors from T.C.A. § 36-1-113 (i) to be most on point: "whether the parent or guardian has made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the child(ren)'s best interest to be in the home of the parent or guardian" (i) and "whether the parent … has made such an adjustment …" The Court finds that these factors weigh against the mother; she has not changed and it will not be possible, by her own admission for the children to return to her care and custody anytime

-9-

in the near future. The Court also takes into account the factor regarding child support, finding that she has not provided (substantial) support despite her means.

With respect to [Jimmy D.], the Court repeats what it has already stated in finding that it is in the best interest of the [Aiden R. B.] [sic] to terminate [Jimmy D.]'s parental rights: he has not visited the child. He has not provided support. He has no relationship with the child. **By clear and convincing evidence, and pursuant to Tenn. Code § 36-1-113(i), the Court finds that it is in the best interest of the children to terminate [Amy B.]'s parental rights and to terminate the parental rights of [Jimmy D.]**

There is no just reason for delay of entry of a final order terminating [Amy B.]'s parental rights or [Jimmy D.]'s parental rights. The petition was filed as to [Amy B.], [John F.], and [Jimmy D.]. However, [Amy B.]'s parental rights and [Jimmy D.]'s parental rights are separate and distinct from each other's parental rights, and those of [John F.]'s, i.e., whether [Amy B.]'s parental rights are terminated has no bearing on [Jimmy D.]'s parental rights or [John F.]'s parental rights. Therefore, pursuant to Tenn. R. Civ. P. 54.02, because there is no just reason for delay, entry of judgment as to [Amy B.] and [Jimmy D.] is directed. Accordingly, this is a final order as to [Amy B.] and as to [Jimmy D.], and is immediately appealable as of right to the Court of Appeals pursuant to Tenn. R. App. 3(a).

That Respondents, [Amy B.] and [Jimmy D.] are not hereafter entitled to notice of proceedings for the adoption of these children nor have they any right to object to such adoption or otherwise to participate in such proceedings.

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED:**

1. That all of the parental rights which Respondents, [Amy B.] and [Jimmy D.], as to these children, [Aiden R. B.] and [Evan M. B.], are hereby forever terminated.

2. That this decree shall have the effect of terminating all the rights, responsibilities, and obligations of Respondents, [Amy B.] and [Jimmy D.], to these children and of the children to Respondents, [Amy B.] and [Jimmy D.], arising from the parental relationship.

3. That Respondents, [Amy B.] and [Jimmy D.], shall have no further

right to notice of proceedings for the adoption of these children and shall have no right to object to the children's adoption, and shall have no relationship, legal or otherwise, with the children.

4. That the complete custody, control and full guardianship of [Aiden R. B.] is hereby awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption <u>in loco parentis</u>.

5. That the complete custody, control and partial guardianship of [Evan M. B.] is hereby awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption <u>in loco parentis</u>.

Mother appeals to this Court. We affirm.

## **Discussion**

Although not stated exactly as such, Mother raises two issues on appeal: 1) whether the Trial Court erred in finding and holding that it was in the Children's best interest for Mother's parental rights to be terminated; and 2) whether the Trial Court erred in terminating Mother's parental rights when, allegedly, evidence presented at trial demonstrated that DCS failed to make reasonable efforts to reunite the Children with their maternal family.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights, stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id*. (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g.*, *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Even though Mother did not raise this issue on appeal, we will address whether the Trial Court erred in finding that DCS had proven by clear and convincing evidence that grounds to terminate Mother's parental rights existed. The statutory provisions upon which the Trial Court terminated Mother's parental rights are contained in Tenn. Code Ann. §§ 36-1-113(g)(1)-(3)(2010), which provide as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive,

so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

Tenn. Code Ann. §§ 36-1-113(g)(1)-(3)(2010).

For the sake of brevity, we will not restate the pertinent facts. The Trial Court found that DCS had proven four grounds for termination of parental rights by clear and convincing evidence: (1) abandonment by failure to support; (2) abandonment for failure to provide a suitable home; (3) substantial non-compliance with a permanency plan; and (4) persistent conditions. Having reviewed the record, we find and hold that the evidence does not preponderate against the Trial Court's findings that DCS had proven clearly and convincingly that all four grounds existed to terminate Mother's parental rights pursuant to

-13-

Tenn. Code Ann. §§ 36-1-113(g)(1)-(3)(2010).

We next address whether the Trial Court erred in finding and holding that it was in the Children's best interest for Mother's parental rights to be terminated. The pertinent statutory provision is Tenn. Code Ann. § 36-1-113(i)(2010) which provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or

-14-

controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2010).

Mother clearly was unable to properly care for the Children. Mother lived in at least nine different residences over a seventeen month period. Mother failed to substantially pay child support. Mother lied about her drug use. Most glaringly, Mother lied in court in an effort to remove the no contact order between Steven V. and the Children, thus potentially jeopardizing the safety of the Children. Mother has thus engaged in a long-term pattern of bad decision-making that shows no genuine sign of relenting.

While Mother visited with the Children while they were in DCS custody and testified that she wished she had more visitation time with the Children, the record as a whole clearly and convincingly shows that the Children's best interest would not be served by the preservation of Mother's parental rights. The Children are in a more stable environment with the foster family. As the evidence does not preponderate against the Trial Court's findings relative to this issue, we affirm the Trial Court's decision that it was in the Children's best interest for Mother's parental rights to be terminated.

We next address whether the Trial Court erred in terminating Mother's parental rights when, allegedly, evidence presented at trial demonstrated that DCS failed to make reasonable efforts to reunite the Children with their maternal family. Mother argues that DCS was required to make reasonable efforts to reunite the Children with their maternal family and failed to do so.

As this Court stated in *State of Tennessee, Department of Children's Services v. S.M.D.*:

The State "must make reasonable efforts to preserve a family before

-15-

seeking to terminate parental rights." *In re: Jeremy D. and Nathan D.*, No. 01-A-01-9510-JV-00479, 1996 Tenn. App. LEXIS 292, at **7-8, 1996 WL 257495, at *3 (Tenn. Ct. App. May 17, 1996), *no appl. perm. appeal filed*. However, "[r]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *In re: R.C.V. and O.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *39, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002), *no. appl. perm. appeal filed*.

*State of Tennessee, Department of Children's Services v. S.M.D.*, 200 S.W.3d 184, 197-98 (Tenn. Ct. App. 2006). DCS was required to make reasonable efforts to "(1)[p]revent the need for removal of the child from such child's family; or (2)[m]ake it possible for the child to return home." Tenn. Code Ann. §§ 37-1-166(a)(1)-(2)(2010). Mother also argues that DCS failed to effectuate the alternative goal of "exit custody with relative" contained in the permanency plan.

We note that this matter does not concern the placement of the Children but instead is a proceeding to terminate Mother's parental rights. We also note that the record shows that Mother's extended family never undertook any legal action to attempt to gain custody of the Children, if ever, until after the petition to terminate Mother's parental rights had been filed after the completion of the dependency and neglect proceeding.

The record reveals that DCS did consider placing the Children with maternal family members but opted against doing so. Moreover, we find no authority requiring DCS to make reasonable efforts to unite a child with members of that child's extended family before terminating a parent's parental rights. We note that such a requirement likely would be a severe strain on DCS's limited resources were DCS required to make reasonable efforts to unite a child with his or her extended family. A child could have a multitude of extended family members. Identifying and contacting a child's extended family and then making efforts to place the child with first one extended family member and then the next and then the next and so on would be immensely burdensome. In any event, DCS is not required under either statutory or case law to make reasonable efforts to reunite children with their extended family prior to terminating a parent's parental rights. To rule otherwise would be to substitute our own policy judgment for that of our General Assembly, something we will not do. We affirm the judgment of the Trial Court in its termination of Mother's parental rights.

**Conclusion**

The judgment of the Trial Court is affirmed.  This cause is remanded to the Trial Court for collection of costs below.  Costs on appeal are taxed to the Appellant, Amy B., and her surety, if any, for which execution may issue, if necessary.


_____
D. MICHAEL SWINEY, JUDGE